UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JAMES SANTIESTEBAN,

                        Plaintiff,

        -against-

NESTLE WATERS NORTH AMERICA, INC.,

                        Defendant.
----------------------------------------------------------------X

**MEMORANDUM & ORDER**
**11 CV 6296 (DRH)(ARL)**

**APPEARANCES:**

**LAW OFFICES OF JOHN C. LUKE, JR.**
Attorneys for Plaintiff
764 Henry Street
Uniondale, New York  11553
By:  John C. Luke, Jr., Esq.

**FOX ROTHSCHILD LLP**
Attorneys for Defendant
100 Park Avenue, Suite 1500
New York, New York  10017
By:  Eli Z. Freedberg, Esq.
     Marvin Weinberg, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff James Santiesteban ("Plaintiff" or "Santiesteban") commenced this action against defendant Nestle Waters North America, Inc. ("Defendant" or "Nestle"), asserting claims of retaliation, discrimination based on religion, hostile work environment, and constructive discharge, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), and New York State Executive Law § 296 *et seq.* ("NYSHRL"), and asserting state law causes of action for negligent infliction of emotional distress and intentional infliction of emotional distress.  Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

The material facts, drawn from the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.

### Plaintiff's Sales Positions at Nestle

Plaintiff is a former employee of Nestle, a company that sells bottled water and related products. (Def.'s R. 56.1 Stmt. ¶¶ 1, 4.) Plaintiff was hired by Nestle as a Sales Representative Commercial ("SRC") after interviewing for the position with John Caturano ("Caturano"), Tom Crook ("Crook") and Ed Cappetta ("Cappetta"). (*Id.* ¶¶ 5, 6.) Cappetta and Caturano were Plaintiff's supervisors while Plaintiff was an SRC. (*Id.* ¶ 7.) As an SRC, Plaintiff sold Nestle services and products to small businesses and received an income of $37,000 per year. (*Id.* ¶¶ 8, 9.) "Plaintiff performed extremely well as a[n] SRC." (*Id.* ¶ 10.)

Not long after Plaintiff began his job as an SRC, Plaintiff was recommended for the position of Key Account Sales Manager ("KASM") by Cappetta. (*Id.* ¶¶ 11, 12.) Plaintiff was subsequently offered the position, and he began working as a KASM on November 2, 2007. (Def.'s R. 56.1 Stmt. ¶ 13.) Plaintiff's salary increased to $52,000 per year. (*Id.* ¶ 14.) In this new position, Plaintiff "targeted larger accounts that employed 25 or more people." (*Id.* ¶ 15.) Similar to his position as an SRC, Plaintiff, as a KASM, did not supervise other employees, rather, other supervisors, such as Zone Sales Development Managers and Sales Managers, supervised the KASMs and SRCs. (*Id.*) Plaintiff was supervised by Michael Connelly ("Connelly") while he was employed as a KASM. (*Id.* ¶ 16.)

In order to evaluate its employees' performances, Nestle set sales goals for its KASMs. (*Id.* ¶ 17.) A KASM received the rating, "unsatisfactory," if he "met less than 85%" of his sales goals; "needs improvement," if he "met 85% to 95%" of his sales goals; "meets expectations," if

he "met 95% to 105%" of his sales goals; "exceeds expectations" if he "met 105% to 119%" of his sales goals; and "outstanding," if he "met more than 120%" of his sales goals. (Def.'s R. 56.1 Stmt. ¶ 18.) Plaintiff's performance was recorded on a sales scorecard, which reflected both actual and projected sales. (*Id.* ¶ 19.)

Plaintiff's performance as a KASM "dropped off precipitously" after his first few months in that position, "and he eventually performed at unsatisfactory levels." (*Id.* ¶ 20.) Specifically, in January 2008, "Plaintiff met 249% of his year to date sales goals"; in February 2008, "Plaintiff met 151% of his year to date sales goals"; in March 2008, "Plaintiff met 104% of his year to date sales goals"; in April 2008, "Plaintiff met 83% of his year to date sales goals"; in May 2008, "Plaintiff met 90% of his year to date sales goals"; in June 2008, "Plaintiff met 76% of his year to date sales goals"; in July 2008, "Plaintiff met 67% of his year to date sales goals"; and, in August 2008, "Plaintiff met 66% of his year to date sales goals." (*Id.* ¶ 21.)[1] "In terms of raw total sales of 'Cooler, DWS, Water' products, Plaintiff sold 87 units in January, 19 units in February, 10 units in March, 16 units in April, 56 units in May, 7 units in June, 8 units in July and 28 units in August." (*Id.* ¶ 22.) Thus, "[b]etween February and August of 2008, Plaintiff only met or exceeded his projected sales goals once, in May of 2008." (*Id.* ¶ 23.)

Nestle also "reviewed Plaintiff's overall performance . . . as a KASM," which included reviewing qualitative and non-selling related factors, "such as 'leads submitted,' 'price management,' 'full line selling,' 'build[ing] customer loyalty,' 'data management' and 'method of operation.' " (Def.'s R. 56.1 Stmt. ¶¶ 24, 25.) One such review observed that "[t]he computer work [wa]s a barrier at times for [Plaintiff]." (*Id.* ¶ 26 (citation and internal quotation marks omitted).) Indeed, Plaintiff admitted "that his computer skills 'weren't the best.' " (*Id.* (citation

---

[1] The Rule 56.1 Statement mistakenly states that these statistics were for the year 2009.

omitted).)  Moreover, Plaintiff was rated as not meeting expectations in both of the reviews that were performed while Plaintiff was a KASM.  (*Id.* ¶ 27.)

While Nestle states that "Plaintiff reverted back to the SRC position" on September 2, 2008, Plaintiff argues that he was demoted to the SRC position.  (*Id.* ¶ 28; Pl.'s R. 56.1 Counterstmt. ¶ 28.)  However, Plaintiff's salary remained $52,000 per year, "[d]espite his return to the SRC position."  (Def.'s R. 56.1 Stmt. ¶ 29.)  Cappetta wanted Plaintiff to return to the SRC position so that Plaintiff could increase the sales numbers of Cappetta's SRC team.  (*Id.* ¶ 30.)

Plaintiff's sales numbers were initially stable upon his return to the SRC position.  (*Id.* ¶ 31.)  However, in 2009, "Plaintiff received a full-year rating of 'needs improvement' in his performance evaluation, in part, because he was not meeting as many potential customers as was required by [Nestle], and . . . because his sales results in the second half of 2009 declined."  (*Id.* ¶ 32.)  Additionally, Plaintiff failed "to undertake 53 sales related activities per day," as was required by Nestle.  (*Id.* ¶ 34.)  As a result, Plaintiff was placed in an SRC development program and given additional coaching.  (*Id.* ¶ 35.)

In 2010, Plaintiff's sales numbers were "on a downward trajectory," and, "[b]y the end of May of 2010, Plaintiff had only been able to make 85% of his projected year to date sales."  (Def.'s R. 56.1 Stmt. ¶ 40.)  On May 6, 2010, Plaintiff's child was born, and "Plaintiff took two weeks of paternity leave."  (*Id.* ¶ 37.)  Subsequently, on or around June 2010, Plaintiff asked Cappetta for a transfer.  (*Id.*)  However, Plaintiff's request was denied because he had not satisfied Defendant's transfer policy guidelines as a result of his recent "needs improvement" evaluation.  (*Id.* ¶ 38.)  Although Plaintiff admits that he received the "needs improvement" rating, he disputes the reason he received that evaluation.  (*Id.* ¶ 39.)  According to Plaintiff, Mr. Cappetta informed Plaintiff that his transfer was denied because of missing cups.  (Pl.'s R. 56.1 Counterstmt. ¶ 39.)

*Plaintiff's Religion*

In 2002, Plaintiff had converted to Judaism. (Def.'s R. 56.1 Stmt. ¶ 41.) While Defendant asserts that, prior to September 2007, Plaintiff had informed Cappetta that he was an observant Jew when he had asked for time off for the high holidays (*id.* ¶ 43), Plaintiff asserts that he told Cappetta that he was Jewish when he asked Cappetta to stop insulting his clothing (Pl.'s R. 56.1 Counterstmt. ¶ 43).

Plaintiff's requests for time off from work for the Jewish holidays were always granted, and Plaintiff was permitted by Nestle and Cappetta to take off for the religious holidays without deducting that time from his sick or personal day allowance. (Def.'s R. 56.1 Stmt. ¶¶ 44, 45, 62.) "Furthermore, when Plaintiff asked Mr. Cappetta for permission to leave early on Fridays, permission was granted and Mr. Cappetta asked Plaintiff to stay late on other days in order to make up the time and missed sales." (*Id.* ¶ 62.)

*Nestle's Harassment Policy and Plaintiff's Claims*

Nestle has a "Non-Harassment Policy and Non-Retaliation Policy" which it reviews with its employees annually. (*Id.* ¶ 46.) In June 2007, "Plaintiff signed a policy acknowledgement form stating that he was given a copy and ha[d] read the Company's policy prohibiting harassment." (*Id.* ¶ 48.) The policy contains procedures for filing complaints of harassment with Nestle's Human Resources Department. (*Id.* ¶ 49.)

In June 2010, Plaintiff reported to Cappetta that Pat Lamberston, a co-employee, had "referred to Plaintiff's tsitsit and yarmulke, two articles of clothing required by Jewish law, as a costume and asked when they were coming off." (*Id.* ¶ 50.) Cappetta relayed Plaintiff's complaint to Mindy Steen ("Steen"), a human resources officer, and Steen promptly contacted Plaintiff to discuss his claims. (Def.'s R. 56.1 Stmt. ¶ 51.) "Plaintiff acknowledged that Human Resources[]

'seemed to be taking his claim very seriously.' " (*Id.* ¶ 52 (citation omitted).) Steen approached Plaintiff " 'right away,' " and, " 'that same day[,] [Plaintiff] told her about everything.' " (*Id.* (citation omitted).) Steen and Plaintiff discussed Plaintiff's claims for " 'a good five or six hours.' " (*Id.* ¶ 53 (citation omitted).) Subsequently, Steen and Plaintiff exchanged emails on June 24, 2010, June 25, 2010, June 28, 2010, June 29, 2010, and June 30, 2010 regarding Plaintiff's claims, and in an effort arrange a follow-up meeting. (*Id.* ¶ 54.) However, prior to arranging a follow-up meeting, Plaintiff sent Steen an email on July 1, 2010 to notify her that " 'Nestle ha[d] forced [him] to leave the job.' " (*Id.* ¶ 55 (citation omitted).)

Even though "Plaintiff claims that his supervisors never ordered kosher food for him at team meetings and ordered sandwiches that contained ham or bacon," Plaintiff "acknowledged that on rare occasions his supervisors would order a plain egg sandwich." (Def.'s R. 56.1 Stmt. ¶ 60.) Moreover, Plaintiff's "co-worker, David Sturza, who is Jewish, recalled that Mr. Cappetta ordered egg sandwiches, eggs with American cheese, and egg white sandwiches." (*Id.* ¶ 61.)

While Plaintiff asserts in the Complaint that his co-workers "made fun of his black and white clothing" when he started working at Nestle, he also "admits that he does not believe that any alleged comments made about the manner of his dress were related to the fact that he is an Orthodox Jew because at that point in time he was not wearing a yarmulke nor did he tell anyone he was Jewish." (*Id.* ¶ 63.) Similarly, despite Plaintiff's claim "that his supervisors attempted to isolate him and two other Jewish co-workers, Michael Brodsky and David Sturza[,] from colleagues and that [Nestle] terminated Mr. Sturza and Mr. Brodsky because of their religion," Sturza and Brodsky "disavowed these allegations." (*Id.* ¶ 64.)

Although Plaintiff asserts that he was unfairly written up by his supervisor on one occasion, he also "admits that the write up, which concerned safety procedures, was rescinded" at the

direction of Steen.  (*Id.* ¶ 65.)

***Plaintiff's Psychological Treatment***

Plaintiff did not seek psychological treatment until the end of his employment with Nestle. (*Id.* ¶ 66.)  He was treated by Alexander Minardi, Ph.D. on or about March 25, 2010.  (Def.'s R. 56.1 Stmt. ¶ 67.)  Dr. Minardi noted that Plaintiff mentioned several issues during his first therapy session, including that: his father was an alcoholic, his three-year employment with Nestle was one of the longest jobs he had had, he never kept a job, he was not doing well at Nestle, and he was " '[h]appiest as a [r]eal [e]state [a]gent.' "  (*Id.* ¶ 67 (citation omitted).)  During Plaintiff's next visit with Dr. Minardi on April 1, 2010, Plaintiff mentioned that: his wife was pregnant, he was not working because of an illness, he had financial debt, and his father was living with him. (*Id.* ¶ 68.)  During an April 15, 2010 visit with Dr. Minardi, Plaintiff "discussed his sales from a personal real estate brokerage business, his sales at [Nestle] and that he visited a lung specialist as a result of his previous illness."  (*Id.* ¶ 69.)  On June 30, 2010, Plaintiff met with Dr. Minardi and discussed his son's birth, "that he was documenting his claims of harassment, and that he met with and retained a discrimination lawyer."  (*Id.* ¶ 70.)  Plaintiff also "noted that he spoke with someone at [Nestle's] human resources but was afraid of being blackballed," and that "he was ready to quit his job."  (*Id.*)

After resigning from Nestle, Plaintiff moved to Tampa, Florida.  (Def.'s R. 56.1 Stmt. ¶ 72.)  Nearly 10 months after his resignation, Plaintiff started visiting the Tampa Jewish Family Services where he "attended only 5 sessions with [a] therapist."  (*Id.* ¶¶ 72, 73.)  Plaintiff paid $36 per session.  (*Id.* ¶ 73.)  During his first session, Plaintiff mentioned that he had stress stemming from his occupation, family, finances and personal life, and that he was living with his in-laws, which was " 'his primary psychosocial stresser.' "  (*Id.* ¶ 74 (citation omitted).)  During his next

session, Plaintiff said that he was feeling less sad. (*Id.* ¶ 75.) Plaintiff reported that he wanted to work on his confidence level and decision making skills, and he talked about his recent inability to make decisions. (*Id.*) During his third session, Plaintiff discussed his strained relationship with his uncle, and he was reported as being " 'visibly in a better mood in comparison to previous sessions.' " (Def.'s R. 56.1 Stmt. ¶ 76 (citation omitted).) In his fourth session, Plaintiff talked about his progress in finding a new job and his relationship with his uncle. (*Id.* ¶ 77.) Plaintiff also talked about "value disagreements" he was having with other family members. (*Id.* (citation and internal quotation marks omitted).) In his final session, Plaintiff discussed "the possibility of moving and finding a new job," and his relationship with his family members and in-laws. (*Id.* ¶ 78.)

## DISCUSSION

### I.     *Summary Judgment Standard*

Summary judgment, pursuant to Rule 56, is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.      *Plaintiff's Discrimination Claims*

## A.      *Legal Standards*

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), the Supreme Court

first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII

employment discrimination claims based on indirect or circumstantial evidence.  This standard

was further refined in *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) and

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993).  Under *McDonnell Douglas* and its

progeny, a plaintiff must first establish a *prima facie* case of discrimination by showing that he:

(1) belonged to a protected class, (2) was qualified for the position he held or sought, and (3)

suffered an adverse employment action (4) under circumstances giving rise to an inference of

discriminatory intent.  *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003).  The burden of

establishing a *prima facie* case of employment discrimination has been described as "modest,"

*Viola*, 42 F.3d at 716, or even "minimal."  *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 168 (2d

Cir. 2001).  It is a burden of production, not persuasion, and involves no credibility assessments.

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142-43 (2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to

"articulate some legitimate, nondiscriminatory reason for [the adverse act]."  *Patterson v. Cnty.*

*of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (citations and internal quotation marks omitted).

The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a

particularly steep hurdle.  Federal courts do not have a "roving commission to review business

judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.

1989) (citation and internal quotation marks omitted), and thus, "[e]vidence that an employer

made a poor business judgment . . . generally is insufficient to establish a genuine issue of fact as

to the credibility of the employer's reasons." *Dister v. Cont'l Grp., Inc*., 859 F.2d 1108, 1116 (2d Cir. 1988).

Should the employer satisfy its burden, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination *vel non*." See *Reeves*, 530 U.S. at 143. To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Express Co*., 853 F.2d 151, 155 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Finally, "the standards for proving discrimination under Section 296 of the New York Executive Law are the same as under Title VII." *Lucas v. S. Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 146 (E.D.N.Y. 1998) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 479 (1982)); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by the same standards as his federal claim")). "[A]ccordingly, the New York Executive Law inquiry is subsumed within the Title VII analysis." *Lucas*, 54 F. Supp. 2d at 146.

**B.**     ***Application to Plaintiff's Discrimination Claims***

Defendant does not contest that Plaintiff is a member of a protected class. Instead,

11

Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination because: "Plaintiff did not suffer an adverse employment action" (Def.'s Mem. at 4); "Plaintiff's performance as a KASM was unsatisfactory" (*id.* at 7); and "Plaintiff's alleged demotion did not occur under circumstances giving rise to an inference of discrimination" (*id.* at 9).

### 1. *Adverse Employment Action*

According to Defendant, Plaintiff alleges only two adverse employment actions: (1) Plaintiff's "demotion" from the KASM position to the SRC position in 2008, and (2) Plaintiff's "write-up" in 2009. (*Id.* at 4.) Defendant argues, however, that neither of these events constituted an adverse employment action. The Court will address each of these events in turn.

### a. *Plaintiff's Transfer from KASM Position to SRC Position*

The Second Circuit "define[s] an adverse employment action as a 'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). A change in working conditions is considered materially adverse when it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation and internal quotation marks omitted). "Examples of such a change include 'termination of employment, a demotion evidenced by decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.' " *Id.* (quoting *Terry*, 336 F.3d at 138); *accord Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164-65 (2d Cir. 2008).

Defendant asserts that Plaintiff's transfer back to the SRC position did not constitute an adverse employment action because Plaintiff did not suffer any reduction in his salary upon his transfer back to the SRC position, and Plaintiff's essential responsibilities in the SRC and KASM positions were the same. (Def.'s Mem. at 5.) Plaintiff, on the other hand, argues that his transfer

from the KASM position back to the SRC position was materially adverse because it terminated his "upward mobility." (Pl.'s Mem. in Opp'n at 13.) Plaintiff cites to Pemberton's deposition testimony in which Pemberton testified that he "never heard" of anyone returning to the KASM role after having been transferred from it. (Pemberton Tr. at 30:19-23.) Since there is no evidence or argument presented by Defendant that a sales person could advance to a different sales position other than the KASM position, Pemberton's deposition testimony demonstrates a triable issue of fact as to whether Plaintiff's upward mobility was effectively terminated upon his transfer from the KASM position.

Plaintiff also argues that when he first transferred from the SRC position to the KASM position, he was given a raise in salary from $39,000 per year to $52,000 per year, "the ability to solicit sales from much larger customers, double the bonuses, [and a] company credit card." (Pl.'s Mem. in Opp'n at 12; Affidavit of Jaime Santiesteban, sworn to on March 22, 2013 ("Santiesteban Aff."), at ¶ 23; Exh. 11 to Declaration of John C. Luke, Jr., dated March 28, 2013 ("Luke Decl."); Exh. 12 to Luke Decl.) However, even though Plaintiff was given these benefits when he transferred to the KASM position, Plaintiff nevertheless concedes that his salary remained at $52,000 when he transferred back to the SRC position, and Plaintiff does not argue or present any facts to show that the other benefits he had been given when he was transferred to the KASM position were taken away upon his transfer back to the SRC position. Nevertheless, the fact that Plaintiff was given a greater salary and benefits upon his transfer from the SRC position to the KASM position demonstrates a triable issue of fact as to whether the KASM position was a more distinguished position than the SRC position. Thus, Plaintiff has come forth with sufficient evidence to show that his transfer from the KASM position back to the SRC position was a materially adverse employment action.

### b.     *Plaintiff's Write-Up*

Unlike Plaintiff's assertion that his transfer back to the SRC position constituted an adverse employment action, Plaintiff's assertion that the "write-up" in 2009 constituted an adverse employment action is incorrect as a matter of law.  It is undisputed that although Plaintiff was written up regarding safety procedures, the write up was subsequently rescinded by Defendant's Human Resources Department.  (Def.'s R. 56.1 Stmt. ¶ 65.)  Under these circumstances, the withdrawn write up does not constitute an adverse employment action as there was no adverse consequence to Plaintiff.  *See, e.g.*, *Butler v. Potter*, 2009 WL 804722, at *13 (E.D.N.Y. March 26, 2009) (finding that a proposed notice of termination was "not a materially adverse action because it [wa]s undisputed that it was expunged and there was no adverse consequence to [the plaintiff], such as the loss of payment or time"); *Cheshire v. Paulson*, 2007 WL 1703180, at *6 (E.D.N.Y. June 12, 2007) ("Nor did the IRS's proposed suspension and termination constitute adverse employment actions, since both were ultimately rescinded.").

### c.     *Denial of Transfer*

The Court notes that Plaintiff asserts a Ninth Claim for Denial of Transfer Due to Discrimination under Title VII, and a Tenth Claim for Denial of Transfer under the New York State Human Rights Law.  (Compl. at 16-17.)  However, these claims pertain to Plaintiff's *prima facie* case of discrimination, and because Plaintiff asserts that the denial of a transfer constituted an adverse employment action (Pl.'s Mem. in Opp'n at 33), the Court will address these additional claims at this juncture.

While it is true that the denial of a transfer may constitute an adverse employment action, it is only so when the transfer sought was not merely a lateral transfer, but, rather, was a transfer to an "objectively better" position.  *Beyer*, 524 F.3d at 164-65 (quoting *Alvarado v. Tex. Rangers*,

492 F.3d 605, 614 (5th Cir. 2007)).  Here, Plaintiff's sole argument that the transfer he sought in or around June 2010 was to a better position is that the position he presently occupied was under the supervision of Cappetta, "the same supervisor that the Plaintiff already complained about twice." (Pl.'s Mem. in Opp'n at 33.)  Thus, Plaintiff argues that the transfer he sought "was his last chance to remove himself from under the thumb of Mr. Cappetta." (*Id.*)  Notably missing from Plaintiff's argument, however, is a description of the position for which he sought a transfer and evidence to show that the position he sought was objectively better than the position he occupied.  Hence, Plaintiff has not presented any facts from which "a reasonable jury could find that the [new] position [he] sought was objectively and materially better than the position [he] occupied and that, accordingly, an adverse employment action had occurred." *Beyer*, 524 F.3d at 164.

## 2.    *Circumstances Giving Rise to an Inference of Discriminatory Intent*

A Title VII plaintiff may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case.  *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).  Here, Plaintiff claims that (1) "the steady barrage of discriminatory commentary from his managers at [Nestle]"; (2) his managers' involvement in the decision to transfer him back to the SRC position; (3) issues other employees had regarding taking time off for the Jewish holidays; (4) the initial refusal to grant him time off for the Jewish high holy days; (5) his managers' refusal to provide him with kosher meals at group lunches; (6) his being sent to Jewish regions to sell merchandise; and (7) the stealing of his sales to give to other non-Jewish employees who were not making their sales, all support inferences of discriminatory animus.  (Pl.'s Mem. in Opp'n at 14-17.)

Plaintiff identifies the following comments that were made to him by his managers:

comments that his black and white clothing made him look like a waiter or a penguin (*id.* at 15); comments about his beard (*id.*); comments that "you people are manipulative" and that "Plaintiff manipulated . . . Cappetta and others into giving him the promotion" (*id.* at 16); and the comment that "Jews only buy from Jews," made by Cappetta and Connelly when they sent Plaintiff to sell merchandise in Jewish locations (*id.* at 17).   As to the first two kinds of comments, Plaintiff has not shown that they were in any way motivated by a religious bias or insensitivity.  For example, Plaintiff asserts in his affidavit submitted upon this motion that comments were made to the effect that his clothing made him look like a waiter or penguin, and that Plaintiff "told Mr. Cappetta [that he] joined a more conservative temple thinking that [Cappetta] would understand but the jokes did not stop."  (Santiesteban Aff. ¶¶ 12, 13.)  Nevertheless, Plaintiff testified at his prior deposition that he did not believe that Cappetta's "particular jokes [about his clothing] were necessarily [about his] being Jewish, . . . because . . . [Cappetta] didn't realize why [he] was dressing that way," (Exh. C. to Declaration of Eli Z. Freedberg, dated February 4, 2013 ("Freedberg Decl."), at 55:7-13), and, that Plaintiff "didn't tell them [that dressing in black and white] was a religious thing that [he] was going through."  (*Id.* at 52:20-23.)  Thus, Plaintiff's affidavit testimony, which is contradicted by his prior deposition testimony, does not provide evidence to suggest that the comments about Plaintiff's clothing were motivated by a religious bias.  *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.")  Similarly, while Plaintiff argues that Cappetta made jokes about Plaintiff's beard (Pl.'s Mem. in Opp'n at 15), Plaintiff does not provide any evidence to show that the alleged comments about his beard were motivated by a discriminatory animus.

On the other hand, the comments that "you people are manipulative," that "Plaintiff manipulated . . . Cappetta and others into giving him the promotion," and that "Jews only buy from Jews," when viewed in light of Plaintiff's other evidence showing that Plaintiff and two other Jewish employees were harassed when they requested time off for the Jewish high holy days, that Plaintiff's managers would not always provide him with kosher meals at group lunches, and that Plaintiff was sent to Jewish locations to sell merchandise even though the sale opportunities in those locations were smaller than the sales he should have been soliciting, provide evidence to permit a jury to infer a discriminatory animus.[2] *See Abdu-Brisson*, 239 F.3d at 468 ("While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." (citations and internal quotation marks omitted)).

### 3.    *Qualified for Position*

In order to make out a prima facie case that a plaintiff was qualified, "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001). As the Second Circuit cautions, "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Id.*

According to Defendant, even if Plaintiff's transfer from the KASM position back to the SRC position constituted an adverse employment action, Plaintiff cannot show that he was

---

[2] Although Plaintiff's affidavit states that his managers stole his sales to give to other non-Jewish employees who were not making their sales (Santiesteban Aff. ¶ 33), Plaintiff previously testified that sales were also stolen from a non-Jewish employee (Exh. 3. to Luke Decl. at 103:17-25, 104:2-18). Thus, Plaintiff has failed to show that any alleged stealing of his sales was driven by a discriminatory animus.

qualified for the KASM position at the time of the transfer because his performance in that position had been unsatisfactory.  (Def.'s Mem. at 7.)  Plaintiff concedes that his sales numbers were low when he was in the KASM position.  However, Plaintiff argues that his numbers were not low enough to justify the transfer, and that he "was set up for failure and targeted."  (Pl.'s Mem. in Opp'n at 9-10.)  The essence of Plaintiff's position is that his performance as an SRC was undisputedly outstanding, and that while his sales decreased upon his transfer to the KASM position, it was not because of Plaintiff's performance *per se*, but, instead, because of Defendant's actions which affected Plaintiff's performance.  Plaintiff asserts that he was sent to Jewish towns to sell products despite the fact that he would not make the type of big sales in those areas that a KASM normally sought to make.  (*Id.* at 10.)  Plaintiff testified that his sales were stolen by his managers to give to other salesmen whose numbers were too low, but that no sales were given to him when his numbers were low.  (*Id.*)  Plaintiff argues that Cappetta, one of his "main antagonists," signed his evaluations, which evaluations utilized subjective criteria. (*Id.* at 11.)  In addition, Plaintiff asserts that Defendants had a Performance Improvement Plan ("PIP") in place for KASMs, such as Plaintiff, who were struggling with their sales, but that Defendants did not place Plaintiff in that program.  (*Id.* at 9.)  Here, a reasonable jury could find that Plaintiff was generally qualified for the KASM position, and that his decreased sales numbers could be attributed, at least in part, to Defendant's conduct.  Thus, Plaintiff has met his minimal burden of showing that he was qualified for the KASM position.

### 4. *Legitimate, Nondiscriminatory Reason for Plaintiff's Transfer*

As noted previously, an employer's burden of showing a legitimate, non-discriminatory reason for its actions is not particularly onerous, and it is not the court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory.  Defendant

asserts that Plaintiff's "transfer back to the SRC role was precipitated by Ed Cappetta's business motivated reasons and not for any discriminatory reason." (Def.'s Mem. at 10.) Defendant notes that it is undisputed that "Cappetta wanted Plaintiff to re-join his [SRC] team in September of 2008 because . . . Cappetta's team struggled to meet its sales goals ever since Plaintiff began working in the KASM role," and that Cappetta frequently communicated with Plaintiff about transferring back to Cappetta's team. (*Id.* (citing Def.'s R. 56.1 Stmt. ¶ 30).) Defendant additionally asserts that Plaintiff's poor performance in the KASM role was another legitimate, non-discriminatory reason for his transfer. (*Id.* n.5.)

### 5. *Pretext*

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant "may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' " *Bombero v. Warner–Lambert Co.*, 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)) (citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)), *aff'd*, 9 F. App'x. 38 (2d Cir. 2001).

Here, the Court agrees with Plaintiff that the previously discussed comments and conduct

of Plaintiff's managers, Cappetta and Connelly, raise a triable issue of fact as to whether Defendant's articulated reasons for transferring Plaintiff are pretext. *See Owens v. N.Y.C. Housing Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (finding that comments made by the plaintiff's managers, who had "substantial influence over [the plaintiff's] employment," were sufficient to "raise a genuine issue of fact on the issue of pretextuality"). In addition, Pemberton testified that Defendant's procedure when transferring a KASM back to the SRC position was to first place the employee in a PIP, and that there should exist a paper record concerning the demotion. (Exh. 4 to Luke Decl. at 12:25, 13:2-4, 13:21-25, 14:2-4, 14:15-21.) However, as Plaintiff points out, Defendant has not provided any evidence of paperwork regarding the transfer, and Plaintiff was never placed in a PIP. (Pl.'s Mem. in Opp'n at 19.) This evidence of Defendant's nonconformity with its normal procedures provides support for Plaintiff's position that Defendant's articulated reasons are pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1219-20 (10th Cir. 2002) (finding that "deviations from normal company procedure" support a plaintiff's argument of pretext).

Despite Defendant's assertion that Plaintiff performed poorly in the KASM position, the Court finds that Plaintiff has raised a triable issue of fact as to whether his unsatisfactory performance in the KASM position was the result, at least in part, of Defendant's conduct. Furthermore, Defendant's argument that Plaintiff concedes that Cappetta wanted Plaintiff to rejoin his team does not dispel a finding of pretext. Instead, Plaintiff need show only that Defendant's proffered reasons were not the only reasons for the transfer, and that at least one of the motivating factors for Defendant's conduct was discriminatory. Plaintiff has met this burden. Accordingly, Defendant's motion to dismiss Plaintiff's first and second claims of discrimination is denied.

**III.** *Plaintiff's Retaliation Claims*

**A.** *Legal Standards*

"Section 704(a) of Title VII makes it unlawful to retaliate against an employee[] 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003) (quoting 42 U.S.C. § 2000e-3(a)). "In order to present a prima facie case of retaliation under Title VII[,] . . . a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII, . . . [2] that the employer was aware of this activity," and "[3] that the employer took adverse action against the plaintiff." *Kessler v. Westchester Cty. Dep't of Social Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (citations and internal quotation marks omitted). In addition, the Supreme Court recently clarified the causation standard required by § 704(a), stating, "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Second Circuit. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry*, 336 F.3d at 141. Once the employee has established a *prima facie* case, the employer "must proffer a legitimate, non-discriminatory reason for the adverse action." *Slattery*, 248 F.3d at 94-95. "If it does so, then the burden shifts back to the [employee] to demonstrate pretext." *Id*. at 95.

Traditionally, courts have applied the same standards for proving retaliation under the NYSHRL that are applied under Title VII. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL." (citation omitted)). However, the effect of the Supreme Court's recent decision in *Nasser* on state law claims of retaliation is presently unclear. *See Sass v. MTA Bus Co.*, 2014 WL 3818663, at *5 (E.D.N.Y. Aug. 4, 2014) ("New York state courts have yet to directly address the impact of *Nassar* on the NYSHRL, and the Second Circuit has not addressed this issue in a reported opinion"); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F. 3d 834, 847 n.7 (2d Cir. 2013) (declining to "decide whether the [plaintiff's] NYSHRL [retaliation] claim [wa]s affected by *Nassar*, which by its terms dealt only with retaliation in violation of Title VII"). Nevertheless, several of the Second Circuit's summary opinions have indicated that courts should continue to apply the same analysis for Title VII and NYSHRL retaliation claims. *See Sass*, 2014 WL 3818663, at *5 (collecting cases). Accordingly, "[s]ince the NYSHRL statutory language" mirrors Title VII's statutory language, "and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court has interpreted and will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence," including use of the but for causation standard enunciated in *Nassar*. *Sass*, 2014 WL 3818663, at *5.

**B.** *Application to Plaintiff's Retaliation Claims*

In addressing the first element of his retaliation claims, Plaintiff asserts in a conclusory fashion that he made four complaints about discriminatory conduct prior to his alleged demotion. (Pl.'s Mem. in Opp'n at 29, 30.) Despite Plaintiff's failure to specifically identify

in his argument the complaints that he allegedly made, the Court gleans from Plaintiff's statement of the facts that he complained (1) to his supervisor, Cappetta, about comments made by Cappetta and other co-workers regarding Plaintiff's black and white clothing (*id.* at 3; Santiesteban Aff. at ¶¶ 12-14); (2) about Cappetta, Connelly, and Pemberton at several roundtable discussions (Pl.'s Mem. in Opp'n at 5; Santiesteban Aff. at ¶¶ 78-80); and (3) in May 2010 to Cappetta, and in June 2010 to Steen, regarding another manager's comments about Plaintiff's clothing (*id.* at 6; Santiesteban Aff. at ¶¶ 83-84).

Defendant argues that there is only once instance of protected activity, i.e., the complaints made in May and June of 2010 regarding the manager's comments about Plaintiff's clothing (Def.'s Mem. at 16), and that the other complaints mentioned in Plaintiff's opposition papers are new claims raised for the first time upon the present motion (Def.'s Reply at 4). Furthermore, Defendant argues that Plaintiff fails to provide any evidentiary support for his new claims other than statements made in Plaintiff's self-serving affidavit offered in opposition to summary judgment, which, notably, either contradict Plaintiff's prior deposition testimony or otherwise fail to allege protected activity. (*See id.* at 1-2, 14 n.3.)

For example, as discussed above, Defendant argues that even though Plaintiff avers in his affidavit that he complained about co-workers and Cappetta's inappropriate joking about his black and white clothing making him look like a "penguin or a waiter," and that the comments continued even after Plaintiff told Cappetta that he had joined a more conservative temple, Plaintiff previously testified that he did not believe that Cappetta's "particular jokes [about his clothing] were necessarily [about Plaintiff] being Jewish, . . . because . . . [Cappetta] didn't realize why [he] was dressing that way." (Exh. C. to Freedberg Decl. at 55:7-13.) Similarly, Defendant argues that while Plaintiff asserts that he complained at roundtable

meetings about Cappetta, Connelly, and Pemberton, he previously testified that he did not complain about Connelly prior to his meeting with Steen in June 2010. (Exh. C. to Freedberg Decl. at 149:24-25; 150:2-4). These contradictory assertions in Plaintiff's affidavit do not raise an issue of fact sufficient to defeat Defendant's summary judgment motion. *See Perma Research*, 410 F.2d at 578 ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.")

Moreover, only "[t]wo activities are protected from retaliation under Title VII: (1) opposing an act of discrimination made unlawful by Title VII and (2) participating in an investigation under Title VII." *Martinez v. Amalgamated Transit Union*, 2005 WL 1485246, at *5 (E.D.N.Y. June 23, 2005). Here, however, Plaintiff's alleged complaints at the roundtable discussions admittedly did not address discriminatory activity proscribed by Title VII, which is evidenced by Plaintiff's affidavit testimony that he "didn't discuss the anti-Semitic behavior" at the roundtable discussions because he was "afraid and embarrassed about what [his] managers might do to [him] in response to [his] complaints." (Santiesteban Aff. at ¶ 75.) Accordingly, Plaintiff's alleged complaints at the round table discussions and about the comments regarding his black and white clothing do not support a finding that Plaintiff engaged in protected activity under Title VII.

As to the only undisputed protected activity, viz. Plaintiff's complaints in May 2010 to Cappetta, and in June 2010 to Steen, regarding another manager's comments about Plaintiff's clothing, Defendant argues that Plaintiff cannot establish the third of element of his retaliation claims, namely, that Nestle took adverse employment action against Plaintiff as a result of

these complaints. (Def.'s Mem. at 17.)

What qualifies as an adverse employment action in the context of a claim of retaliation is much broader than in the context of a claim of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."); *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (concluding that "[p]rior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment no longer represent the state of the law" (internal citations omitted)). The applicable test in the retaliation context is that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C.Cir. 2006)) (internal quotation marks omitted).

Here, Plaintiff alleges that after he reported to Cappetta in May 2010 that another manager, Pat Lamberston, referred to his tzitzit as a costume, Cappetta, in turn, reported the incident to Steen in Human Resources, who promptly contacted Plaintiff to discuss his claims. Plaintiff admits that Steen seemed to take his complaint seriously, and that they spent at least five to six hours discussing Plaintiff's claim, and exchanged a series of emails thereafter regarding Plaintiff's claim. Indeed, Plaintiff and Steen had been trying to arrange a second meeting, but, prior to successfully doing so, Plaintiff announced his resignation from Nestle. Under these circumstances, the Court agrees with Defendant that Plaintiff has not come forth with evidence to show that Nestle took adverse action against Plaintiff after he complained to Cappetta and Steen. On the contrary, the evidence reveals that Nestle immediately responded

to Plaintiff's complaint and was seriously discussing the matter with him.  Even if Plaintiff was unsatisfied with Nestle's progress in investigating his complaint, it cannot be said that Nestle's actions after Plaintiff complained to Cappetta and Steen would "have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (internal quotation marks omitted).

Moreover, although Plaintiff also argues that after his complaint was relayed to Steen, Cappetta "ignored him completely" (Pl.'s Mem. in Opp'n at 30), this claim does not evidence a materially adverse employment action.  *See Hamilton v. RDI/Caesars Riverboat Casino, LLC*, 179 F. Supp. 2d 929, 940 (S.D. Ind. 2002) ("Binding case law makes clear[] . . . that . . . silent treatment and ostracism do not constitute materially adverse employment actions." (citation omitted)).  Accordingly, Plaintiff has failed to present a prima facie case of retaliation.

## IV.  *Plaintiff's Hostile Work Environment Claims*

### A.  *Legal Standards*

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) (internal quotation marks omitted).  In order to establish a hostile work environment claim, a plaintiff must prove: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Id.* (alteration in original) (citation and internal quotation marks omitted).  "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive

enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 501 U.S. 17, 21 (1993)); *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.").

"Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret*, 451 F.3d at 149 (quoting *Patterson*, 375 F.3d at 227). However, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment," instead, courts are to "view the circumstances in their totality, examining the nature, severity, and frequency of the conduct." *Alfano*, 294 F.3d at 379. What is necessary is that plaintiff establish a link between the actions by defendants, and plaintiff's membership in a protected class. *Id.* at 374; *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).[3]

**B.**     *Analysis*

Plaintiff argues that several incidents provide evidence that he was subjected to an abusive work environment. (Pl.'s Mem. in Opp'n at 23.) Plaintiff argues that: (1) even though Nestle "eventually" gave him permission to take off work for religious holidays, it was "only after telling the Plaintiff that maybe he should not take the day because it [would] interfere[] with his work and that he [could not] tell other Jewish employees"; (2) after Plaintiff began as a KASM, his new manager, Connelly, commented, "you people are

---

[3] Hostile work environment claims under the NYSHRL "are analyzed under the same standard as Title VII hostile work environment claims." *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013); *accord Kelly*, 716 F.3d at 14.

manipulative"; (3) Plaintiff was improperly written up; (4) Cappetta sent Plaintiff an email which made a comment about the "sunset being later" on Fridays; (5) Cappetta insulted Plaintiff's black and white clothing; (6) supervisors insulted his beard; (7) Connelly and Cappetta frequently sent Plaintiff to sell at Jewish locations because "all Jews stick together"; (8) Connelly gave Plaintiff's sales to non-Jews whose sale numbers were too low, even though Plaintiff and two other Jewish employees were not given the same benefit; (9) Plaintiff was criticized by his managers for his observance of the Sabbath and his kosher diet; (10) Plaintiff was not permitted to meet with his company mentor; and (11) a manager, Lamberston, insulted Plaintiff's tassels by stating, "I didn't know it was Halloween and when are you going to take that off?" (Pl.'s Mem. in Opp'n at 23-24 (citations omitted).)

    As a preliminary matter, certain of Plaintiff's claims, considered in isolation, do not support a finding that his work environment was abusive. For example, it is uncontested that the write up of Plaintiff was subsequently withdrawn by the Human Resources Department after it was contested by Plaintiff. In addition, in the March 12, 2010 email from Cappetta to Plaintiff, which includes as its subject, "Passover high holy days," Cappetta states:

> Jamie, I marked my calendar with the dates below no problem. This weekend we will be changing our clocks and sunset will be later in the day so this will give you even more field time on Friday's [sic] to support your efforts.
>
> I can't wait for the sun to go down in the summer around 7 or 8[.] I still can cut my grass when I get home . . . LOL !!!!
>
> Thanks Ed

(Exh. 8 to Luke Decl.) Assuming the admissibility of this email, a reasonable jury could not find that Cappetta's statement about the sun setting later during the summer months constitutes evidence of discriminatory intimidation. Indeed, on the contrary, the email demonstrates that Cappetta permitted Plaintiff to observe his high holy days without objection, and that Cappetta

merely observed that Plaintiff would be able to work later on Fridays in the summer because the sun would be setting at a later time.

Moreover, as discussed *supra*, the evidence does not show that the comments about Plaintiff's black and white clothing and his beard were motivated by a religious bias.  Similarly, even if some of Plaintiff's sales were given to other employees, Plaintiff testified that Connelly did the same thing to "the other KASM, Michael Gwynn," who was not Jewish.  (*See* Exh. 3 to Luke Decl. at 102:16-25, 103:2-25, 104:2-18.)

Nevertheless, in viewing the totality of the circumstances in a light most favorable to Plaintiff, the Court finds that Plaintiff has tenuously shown that his supervisors' alleged misconduct was pervasive enough to create an objectively hostile work environment.  "Courts review the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' "  *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 23).  Here, Plaintiff's assertion that he was sent to Jewish locations to sell products, even though he would not be able to make the large sales in those locations that a KASM should be making, provides evidence that his supervisors' conduct interfered with his work performance.  In addition, Plaintiff's evidence shows that the conduct and comments in this case were more than occasional, particularly the conduct and comments regarding Plaintiff's kosher diet and his observance of the high holy days.  (*See* Santiesteban Aff. ¶¶ 17, 19.)  In sum, "the quality and quantity of the incidents described by [Plaintiff] is sufficient to raise triable questions better left for a jury."  *Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 79 (E.D.N.Y. 2009).

The second element of Plaintiff's hostile work environment claim requires Plaintiff to establish that his supervisors' conduct can be imputed to Nestle. Under Title VII, an employer's liability for an employee's harassing conduct "may depend on the status of the harasser." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). If the harassing employee was a supervisor, namely, someone who was "empowered . . . to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,' " the employer will be strictly liable "[i]f the supervisor's harassment culminate[d] in a tangible employment action." *Id.* at 2439, 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "But if no tangible employment action [wa]s taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* at 2439. "If the harassing employee is the victim's co-worker," however, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

Moreover, "[u]nder the NYSHRL, 'liability for an employee's discriminatory acts may not be imputed to an employer . . . unless the employer became a party to it by encouraging, condoning, or approving it.' " *Parra v. City of White Plains*, 2014 WL 4468089, at *6 (S.D.N.Y. Sept. 4, 2014) (quoting *Brown v. City of New York*, 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013)).

In this case, Defendant does not dispute that the alleged harassing employees were Plaintiff's supervisors. Defendant argues, however, that it cannot be held liable for any alleged

misconduct because it "maintained an anti-harassment policy which was distributed to all employees," and "Plaintiff failed to take reasonable steps to avoid the alleged harassment [that] he complains of in this action." (Def.'s Mem. at 21-22.) Nonetheless, there is a genuine issue of fact as to whether Defendant is entitled to raise the affirmative defense and whether Defendant may be held strictly liable. As discussed *supra*, there are triable issues of fact as to whether Plaintiff's transfer from the KASM position constituted an undesirable reassignment or demotion such that the transfer constituted a tangible employment action, and whether the alleged harassment by Plaintiff's supervisors culminated in Plaintiff's transfer from the KASM position, i.e., whether Plaintiff's transfer was the result of his supervisors' harassment. Thus, summary judgment in favor of Defendant on Plaintiff's Title VII hostile work environment claim is denied. In addition, since Defendant has not argued that it was not a party to the discriminatory acts by approving, condoning, or encouraging them, summary judgment for Defendant on Plaintiff's NYSHRL hostile work environment claims is similarly denied.

## V. *Plaintiff's Constructive Discharge Claims*

### A. *Legal Standards*

An employee is constructively discharged when the employer, instead of terminating the employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Miller v. Praxair, Inc.*, 408 F. App'x. 408, 410 (2d Cir. 2010) (quoting *Terry*, 336 F.3d at 151-52) (internal quotation marks omitted). This standard, which "is the same under state and federal law," *id.*, is something more than what is required to demonstrate a hostile work environment. *See Arroyo v. WestLB Admin., Inc*., 54 F. Supp. 2d 224, 232 (S.D.N.Y. 1999) (stating that a plaintiff claiming constructive discharge "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working

environment") (citations and internal quotation marks omitted), *aff'd*, 213 F.3d 625 (2000) (summary order). "[C]onstructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Praxair*, 408 F. App'x. at 410 (quoting *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)) (internal quotation marks omitted). Courts employ a two-pronged analysis for this determination, examining both "the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). Although the plaintiff is not burdened with proving specific intent, he must at least show that "the employer's actions were 'deliberate' and not merely 'negligent or ineffective.' " *Id.* at 230 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000)). Further, the standard is objective; Courts must resolve whether the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

**B.**     *Analysis*

While Plaintiff argues generally that he was subjected to discriminatory conduct and actions by his supervisors throughout his employment (Pl.'s Mem. in Opp'n at 31), his conclusory and unspecific arguments are not sufficient to defeat summary judgment. Plaintiff does, however, argue more specifically that three events during his last sixty days at Nestle "ratchet[ed] up the harassment to the breaking point," namely, Lamberston's comment about his clothing, Cappetta's denial of his transfer request, and Nestle's failure to investigate his complaints after his meeting with Steen. (Pl.'s Mem. in Opp'n at 31-32.) Plaintiff additionally points to the "cold treatment" he received from his supervisors and coworkers after his meeting with Steen. (*Id.* at 32.)

As to Plaintiff's argument that Nestle failed to investigate his complaints after his meeting with Steen, it is undisputed that "Plaintiff acknowledged that Human Resources[] 'seemed to be taking his claim very seriously.' " (Def.'s R. 56.1 Stmt. ¶ 52 (citation omitted).)  Although Plaintiff argues that "no action and no real communication regarding the situation" occurred in the weeks following Plaintiff's meeting with Steen (Pl.'s Mem. in Opp'n at 32), it is undisputed that Steen and Plaintiff exchanged emails on June 24, 2010, June 25, 2010, June 28, 2010, June 29, 2010, and June 30, 2010 regarding Plaintiff's claims, and that Plaintiff and Steen were making efforts to arrange a follow-up meeting, but Plaintiff resigned only four to six weeks after complaining to Steen and prior to meeting with her again.  (Def.'s R. 56.1 Stmt. ¶ 54; Exh. 3 to Luke Decl. at 190:2-6.)

Even considering Plaintiff's arguments that the harassment was ratcheted up to the breaking point by Cappetta's denial of his transfer request, Lamberston's comment about his clothing, and his supervisors giving him the cold shoulder, and considering the previously discussed instances of alleged discriminatory comments and conduct which were not specifically raised by Plaintiff in support of this claim, Plaintiff simply has not come forth with facts to show that Defendant deliberately made his working conditions so intolerable that a reasonable person in his circumstances would have had no choice but to resign.

Unlike cases where the plaintiff showed the employer's specific intent, for example, by showing that the employer informed the plaintiff that he would be fired regardless of whether his performance improved, *see Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987), or blatantly told the plaintiff that her resignation was desired, *see Welch v. Univ. of Tex. & Its Marine Sci. Inst.*, 659 F.2d 531, 534 (5th Cir. 1981), here, it is undisputed that Cappetta wanted Plaintiff on his SRC team to boost the team's sales numbers.  (*See* Def.'s R. 56.1 Stmt. ¶ 30.)  Indeed,

Plaintiff has not come forth with any evidence to allow a factfinder to conclude that Defendant wanted Plaintiff to resign and, thus, deliberately created working conditions to force his resignation. *See Lee v. Sony BMG Music Entm't, Inc.*, 2010 WL 743948, at *9 (S.D.N.Y. March 3, 2010) ("[I]f a plaintiff cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective, . . . [and that the] deliberate acts [were] taken for the purpose of forcing plaintiff to resign" (internal citations and quotation marks omitted)). While the Second Circuit in *Whidbee* declined to decide the question of whether the level of conduct sufficient to support a hostile work environment claim is sufficient to support a constructive discharge claim, and observed that it has not clarified the relationship between the intolerability of working conditions and the deliberateness required to find a constructive discharge, it did make clear that evidence that the employer wanted to retain the employee undercuts a finding of constructive discharge. 223 F.3d at 73-74; *see also Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (finding no constructive discharge because, *inter alia*, the evidence showed that the defendant wanted the plaintiff to remain in its employ). Thus, in this case, the undisputed fact that Cappetta wanted Plaintiff on his SRC team defeats any claimed constructive discharge. Accordingly, Plaintiff's constructive discharge claims are dismissed.

**VI.** ***Plaintiff's Negligent and Intentional Infliction of Emotional Distress Claims***

Liability for negligent or intentional infliction of emotional distress will be found only where the "defendant engaged in conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Meadows v. Planet Aid, Inc.*, 676 F. Supp. 2d 83, 97-98 (E.D.N.Y. 2009) (citations and internal quotation marks omitted); *accord Romero v. City of*

*New York*, 839 F. Supp. 2d 588, 630-31 (E.D.N.Y. 2012).  Further, while a plaintiff is not required to show that he suffered physical injury as part of his claim for negligent infliction of emotional distress, "the circumstances under which recovery may be had for purely emotional harm are extremely limited," and, therefore, the plaintiff's claim "must generally be premised upon breach of a duty owed directly to plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety."  *Meadows*, 676 F. Supp. 2d at 98 (quoting *Blake v. Race*, 487 F. Supp. 2d 187, 219 (E.D.N.Y. 2007)) (internal quotation marks omitted).

Here, Plaintiff argues only that he can provide credible evidence to demonstrate that his emotional distress damages were more than mere garden variety damages.  (Pl.'s Mem. in Opp'n at 34-35.)  However, Plaintiff fails to present any argument that the conduct at issue rose to the level of outrageous character required to sustain his claims.  Moreover, the Court finds that Plaintiff's allegations, even if assumed to be true, fall short of the type of outrageous conduct required to state a cause of action for negligent or intentional infliction of emotional distress.  Accordingly, these claims are dismissed.

### *CONCLUSION*

For the reasons stated above, Defendant's motion for summary judgment is granted as to Plaintiff's claims of retaliation, denial of transfer, constructive discharge, negligent infliction of emotional distress and intentional infliction of emotional distress, and denied as to Plaintiff's claims of discrimination and hostile work environment.

**SO ORDERED.**

Dated: Central Islip, New York
      October 15, 2014

                                    _____/s/_____
                                      Denis R. Hurley
                                      United States Senior District Judge